El Pueblo de Puerto Rico, demandante y apelado, *v.*
Antonio Marchany, acusado y apelante.

Núm. 9681.—*Sometido:* Marzo 19, 1943. *Resuelto:* Marzo 31, 1943.

*Celestino Iriarte, F. Fernández Cuyar* y *H. González Blanes,* aboga-
dos del apelante; *R. A. Gómez, Fiscal del Tribunal Supremo* y
*Luis Negrón Fernández, Fiscal Auxiliar,* abogados de El Pueblo,
apelado.

El Juez Asociado Señor Snyder emitió la opinión del tri-
bunal.

El doctor Antonio Marchany, por orden del fiscal de dis-
trito, practicó la autopsia al cadáver de Roque Pérez, quien
había fallecido a consecuencias de una herida de bala. En
el juicio contra Ovidio Vélez por el alegado asesinato de Pé-
rez, Marchany fué testigo del Pueblo. Durante su interro-
gatorio, el doctor Marchany declaró que un plomo mostrá-
dole por el fiscal de distrito no era el plomo que él extrajo
del cadáver de Pérez. El doctor Marchany también declaró
que Pérez Segarra, un jefe de policía que estuvo presente al
practicarse la autopsia, había solicitado ver el plomo y, ha-

·ciendo caso omiso de su petición para que lo devolviera con ·el fin de que el doctor lo entregara al fiscal de distrito, se marchó llevándoselo.

Al día siguiente, mientras continuaba celebrándose el juicio por asesinato, la corte inferior, en un nuevo caso titulado *El Pueblo de Puerto Rico* v. *Antonio Marchany,* delito: Desacato por Perjurio, dictó la siguiente orden:

"Por CUANTO: En el día de ayer y durante el caso original de El Pueblo de Puerto Rico contra Ovidio Vélez Hernández, que está pendiente en esta Corte por el delito de asesinato en segundo grado, el Dr. Antonio Marchany compareció como testigo y prestó juramento ·de decir la verdad ante esta corte y después de prestar dicho juramento, intencionalmente y aparentemente contrario al mismo declaró ·que una bala que le fué mostrada por el fiscal no fué la bala que él extrajo del cuerpo del interfecto Roque Pérez cuando hizo la .autopsia de dicho finado, a pesar de que el Jefe de la Policía, Ángel Pérez Segarra, declaró que la autopsia se hizo en su presencia y ·que allí el Dr. Marchany le entregó la bala que éste niega ser la ·misma, y a pesar de que dos testigos más corroboran bajo juramento la declaración del Jefe Segarra, y el hecho de haber estado presente en el momento de la autopsia y de la entrega de la bala;

"Por CUANTO: La declaración referida es sobre un hecho esencial al resultado del proceso y el Juez de esta corte, ha quedado, prima ·facie, convencido de que el Dr. Antonio Marchany después de prestar un juramento ante esta corte para decir la verdad es aparentemente culpable de perjurio, de acuerdo con la Ley de 9 de marzo de 1911 para proveer el Castigo Sumario por el Delito de Perjurio cometido ·en Corte abierta y para otros fines;

"Por TANTO: A moción propia de esta corte se ordena el arresto ·del Dr. Antonio Marchany y se dispone, además, que dicho Antonio Marchany comparezca ante esta corte el día 9 de mayo de 1941 .a las dos P. M. y explique las razones que tuviere por las cuales no debe ser castigado por desacato a la corte, en cuyo acto presentará su defensa y las pruebas que tenga, a los efectos de que el caso quede resuelto de acuerdo con la ley. Mientras se celebra el juicio ·el acusado podrá prestar una fianza de $500 para obtener su libertad provisional."

Posteriormente, el doctor Marchany fué juzgado y convicto por la corte de distrito por el referido delito de desa-

por perjurio. Ha apelado de la sentencia que lo con-
a dos meses de cárcel.

El fiscal de esta Corte se une al abogado del acusado en
citud de que la sentencia condenatoria sea revocada. Sin
argo, el fiscal solicita que se ordene un nuevo juicio,
ntras que el acusado suplica que se dicte una sentencia
olviéndolo.

El fiscal admite que la corte inferior cometió un
or fundamental cuando, poco antes de que el Pueblo ter-
nara su caso, resolvió lo siguiente:

". . . Éste no es un caso corriente en que hay una presunción de
cencia, la presunción es de culpabilidad en estos casos de per-
io. Cuando el Juez dicta la orden, la ley dice que tiene que estar
nvencido de que él ha mentido, luego la presunción es de culpa-
lidad."

El abogado del acusado inmediatamente tomó excepción
e la resolución de la corte afirmando que "en todo caso la
resunción es la de que el acusado es inocente hasta que se
e pruebe lo contrario".

Ningún derecho es más fundamental bajo nuestras leyes
que el de la presunción de inocencia en una causa criminal.
Si las cortes no se adhieren firmemente a esta doctrina, uno
de los baluartes más sólidos de nuestro sistema de vida pe-
ligrará. Véase *Pueblo* v. *Plata*, 38 D.P.R. 89. La presun-
ción prevalece tanto ante un tribunal de derecho como en un
juicio por jurado (1 Wharton's *Criminal Evidence*, Sec. 72,
pág. 87; *People* v. *Ward*, 239 N. W. 355 (Mich. 1931) ).
Acompaña al acusado tanto en un juicio por desacato crimi-
nal como en cualquiera otra causa criminal. (*Michaelson* v.
*United States*, 266 U. S. 42, 66).

Al resolver que en un caso de esta naturaleza existía una
presunción de culpabilidad, la corte inferior estaba en efecto
resolviendo que tan pronto como se dicta la orden para mos-
trar causa, debe considerarse el caso como uno ya probado
contra el acusado, y que lo único que hay que hacer es oír

su defensa, si alguna tiene. Tal interpretación de la
Estableciendo el Delito de Perjurio en Corte abierta l
ría graves dificultades constitucionales. Debe tenerse
sente que un testigo no es el enjuiciado. Si se tiene la c
cia de que ha declarado falsamente, debe así acusárse
celebrársele una vista en la que debe presentarse tod
prueba contra él. En el presente caso la corte inferior
lebró la vista. Pero en vez de exigir al Pueblo que con
zara un nuevo proceso y se ofreciera toda la evidencia
cesaria para declarar culpable al acusado, la corte infer
bajo el concepto erróneo de que se había establecido ya
caso prima facie contra el Dr. Marchany, declaró que exis
una presunción de culpabilidad contra el acusado y dirigió
procedimiento por el delito de desacato como si fuera pa
integrante del caso de asesinato, refiriéndose a y toman
en consideración evidencia que había sido presentada en
juicio de asesinato ante un jurado, pero que no había si
presentada en ningún momento ante el juez, el cual estal
únicamente viendo la acusación de desacato. En verdad,
defecto del pronunciamiento de la corte inferior al efecto d
que el acusado se defendía bajo una presunción de culpab
lidad, se hizo evidentemente clara cuando la corte, durant
el juicio, tomó en consideración evidencia que se le habí
presentado en el caso de asesinato en el cual el doctor Mar
chany no era el acusado.

Es obvio que la corte inferior confundió sus dos funcio-
nes separadas en casos de esta clase. Cuando se acusa a un
testigo de desacato por perjurio en corte abierta, el juez al
dictar la orden para mostrar causa puede ser comparado con
un juez instructor (*committing magistrate*) que encuentra
causa probable, o con un fiscal de distrito que radica una
acusación. Pero en el juicio por tal delito, cuando el testigo
por primera vez se convierte en acusado, el proceso debe em-
pezar de nuevo e introducirse toda la evidencia necesaria
para declarar culpable al acusado, quien en todo momento

durante el curso del nuevo procedimiento goza del beneficio de la presunción de inocencia. Esto se ha hecho constar muy claramente en una serie de casos resueltos por esta Corte. En *Pueblo* v. *Aquino,* 33 D.P.R. 255, dijimos, por voz del Juez Presidente Sr. Del Toro, lo siguiente, a la página 262:

"Estudiando en su totalidad la ley de que se trata, se observa que hay dos momentos en que se mueve y actúa la conciencia del juez. Es el primero cuando al prestar su declaración en el juicio, queda el juez convencido de que el testigo es un perjuro. Entonces es el deber del juez, a moción propia, ordenar el arresto del testigo, fijando día para la comparecencia. Y es el segundo cuando el juez habiendo ya actuado, se dispone a investigar el caso en sí mismo, oyendo no sólo las declaraciones de la defensa, sino las de la acusación. Para que la ley sea constitucional, el acusado debe ser informado claramente del cargo, debe la acusación aportar la prueba de la existencia del delito y debe darse una oportunidad de defenderse al acusado, incluyendo su claro derecho a confrontarse con los testigos en su contra. Todo sumariamente, pero todo derecho garantido por igual."

La mayoría de los otros errores señalados por el acusado fueron cometidos por la corte inferior como resultado de su equivocada interpretación del alcance del estatuto estableciendo el delito en cuestión y la función de la corte de distrito de conformidad con el mismo. Como se dijo en el caso de *Aquino* a la página 262, "No debe el juez basar su sentencia en su primera apreciación. Su primera apreciación lo llevó a iniciar el procedimiento. Libre de prejuicios debe disponerse luego a juzgar el caso en sí mismo, *independientemente, de acuerdo con la prueba que ante él se practique.*" (Bastardillas nuestras). Sin embargo, el juez de distrito, en violación de esta regla de que la vista de desacato debe ser *de novo,* repetidamente recurrió a su memoria en cuanto a la prueba presentada en el caso de asesinato, en vez de permitir al abogado desarrollar los hechos independientemente en el juicio por el delito de desacato. Por ejemplo, cuando a un tal Carrasquillo, quien había estado presente cuando se

hizo la autopsia y se extrajo el plomo del cuerpo del inter-
fecto, se le hizo al ser contrainterrogado por el abogado del
acusado la pregunta, sumamente importante, de que si había
declarado en el juicio por asesinato que el plomo había sido
marcado para futura identificación, el juez de distrito, antes
de que el testigo pudiera contestar, interrumpió manifestando
"No declaró que se haya marcado".

De igual modo, la corte inferior restringió severamente
el contrainterrogatorio de los testigos, particularmente el de
Pérez Segarra, el principal testigo del Pueblo, algunas veces
negándose a permitir el contrainterrogatorio sobre cuestiones
tan vitales como la de si el plomo fué marcado para futura
identificación y a veces empeñándose en contestar por los
testigos, y dando por respuesta información que el juez de
distrito aparentemente había recogido al presidir el juicio
por asesinato.

El juez de distrito también se convirtió en testigo en di-
versas ocasiones. Por ejemplo, cuando el fiscal de distrito
era contrainterrogado por el abogado del acusado, se le pre-
guntó: "¿El testigo asegura que el Doctor no vió esa bala el
día del juicio?" Antes de que pudiera contestar, la corte in-
tercaló el siguiente comentario: "La corte tiene conocimiento
de ello: Él dijo: 'Ésta no es la bala,' sin examinarla, y eso
me indujo a librar la orden."

La versión del doctor Marchany en cuanto a este episodio
fué bastante diferente. Declaró que mientras se hallaba en
la silla testifical en el juicio por asesinato pudo ver claramente
el plomo mientras éste estaba sobre una mesa cerca de él y
mientras el fiscal de distrito lo tenía en su mano y tuvo am-
plia oportunidad de examinarlo cuidadosamente antes de que
se le preguntara si ése era el plomo extraído por él del ca-
dáver de Pérez. Es difícil comprender cómo pudo el doctor
Marchany tener un juicio imparcial de un juez que se em-
peña en declarar en un caso y cuyo testimonio está en con-
flicto con el del acusado.

La corte inferior distó mucho de seguir la pauta impués-tale por el caso de *Aquino,* mediante la cual tenía que des-prenderse de todas las nociones preconcebidas en cuanto a la culpabilidad del acusado, y conducir un juicio *de novo* de una manera imparcial y desprendida. Ejemplos de las vio-laciones de la corte inferior a esta regla saturan todo el ré-cord. Señalarlas sería alargar indebidamente esta opinión. Nos limitamos a citar los ejemplos típicos ya mencionados.

Es también evidente que la corte de distrito había prejuz-gado este caso antes de que el juicio comenzara. Esto quedó demostrado, entre otras cosas, por sus frecuentes referencias a la apelación para ante esta corte, que sólo podía ocurrir en caso de una convicción. No debe entenderse como que resol-vemos que el mero hecho de que una corte inferior tenga en mente la posibilidad de una apelación constituye error. Al contrario, es el deber de la corte de distrito velar que el ré-cord se haga de tal manera que el derecho de apelación sea protegido con efectividad. Pero aquí la corte inferior, como admite el fiscal de este tribunal, fué mucho más lejos. La declaración al comenzar el juicio de que el acusado era pre-suntivamente culpable, la manera en que el juez de distrito discutía una apelación—que él indicó en muchas ocasiones que se establecería—y la forma en que insistía en desarrollar los hechos, todo indica que era su creencia que sólo estaba cumpliendo con la mera formalidad de dar al acusado una oportunidad de refutar, si podía, la imputación de culpabili-dad de la que la corte inferior ya estaba convencida.

No olvidamos los males y circunstancias especiales que indujeron a la Asamblea Legislativa a establecer el delito de desacato por perjurio en corte abierta. Véase *Pueblo* v. *Aquino,* supra. Es un arma poderosa de prosecución que el Pueblo y las cortes pueden y deben usar con efectividad. Pero una determinación laudable de conservar la integridad de los procedimientos ante las cortes no debe degenerar en un

juicio pro forma (*trial by fiat*). El hecho de que éste es un procedimiento sumario no autoriza a las cortes a prescindir del requisito constitucional de que un acusado debe ser confrontado con los testigos en su contra durante su juicio, esto es, en el juicio por el delito de desacato. La Asamblea Legislativa, al instituir al juez tanto en acusador como en juzgador, le impuso una delicada tarea. Si no se cree competente para cumplir su tarea en un caso determinado, debe buscar los medios para que el juicio sea presidido por otro juez.

El acusado también alega que la orden para mostrar causa no contenía hechos suficientes para imputar el delito de desacato por perjurio en corte abierta. Si bien la orden fué redactada en un lenguaje algo perifrástico, estamos convencidos de que los elementos esenciales del delito imputado surgen del cuerpo de la orden. Por tanto estaríamos dispuestos a revocar la sentencia y devolver el caso para nuevo juicio, a no ser por un error que, aunque no ha sido señalado y discutido por el acusado, es tan serio que nos obliga a dictar una sentencia absolviéndolo.

La sección 1 de la Ley núm. 41, Leyes de Puerto Rico, 1911 (pág. 136), tal como se encuéntra a la página 69 de nuestro Código Penal, ed. 1937, al definir el delito de desacato por perjurio en corte abierta, dispone, como en todos los estatutos sobre perjurio, que el acusado debe falsamente declarar como cierta "cualquier cosa substancial". La corte inferior tenía conocimiento de este requisito. Su orden para mostrar causa decía que "La declaración referida es sobre un hecho esencial al resultado del proceso . . .". Sin embargo, hubo una completa falta de prueba en el juicio por desacato en cuanto a la materialidad de la declaración del doctor Marchany en el juicio por asesinato en relación con la identificación del plomo extraído por él del cuerpo del interfecto. Aquí también la corte inferior pudo haber creído

que tenía derecho a descansar en su conocimiento previo del testimonio ofrecido en el juicio por asesinato. Pero el permitir tal práctica equivaldría, en adición a lo que ya se ha dicho aquí, a destruir el derecho de apelación del acusado. "La ley expresamente concede una apelación. ¿Cómo podrán los jueces de la corte de apelación formar concepto si el juez sentenciador deja guardada en su propia conciencia la prueba que apreciara en un juicio distinto no conocido para ellos?" (*Pueblo* v. *Aquino,* 33 D.P.R. 255, 63).

El acusado tiene derecho a que se decidan ésta y todas las demás cuestiones aquí envueltas, por el récord tomado en el caso de desacato y que es el único récord ante nos. Por tanto, era el deber del Pueblo presentar en el juicio de desacato prueba tendiente a demostrar la materialidad de esta parte de la declaración del doctor Marchany. No se hizo esto. Nada hay en el récord que demuestre afirmativamente la materialidad de la declaración en cuestión. Si, por ejemplo, el caso de asesinato hubiera ido a juicio bajo la teoría de defensa propia, la identificación del plomo hubiera podido ser enteramente inmaterial. No tenemos manera alguna de conocer los hechos y no tenemos derecho a especular en cuanto a las posibilidades. Toda vez que los hechos tal como se adujeron en el juicio de desacato son tan consistentes con la inocencia como lo son con la culpabilidad, no tenemos otra alternativa que decretar la absolución del acusado.

*La sentencia de la corte de distrito que condenó al acusado a dos meses de cárcel será revocada, y se dictará una nueva sentencia absolviéndolo.*

El Juez Asociado Sr. Todd, Jr., no intervino.